UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| TERRY L. BRADY, | ) |  |
|---|---|---|
| Plaintiff, | ) | |
|  | ) | CAUSE NO. 1:09-CV-110 |
| v. | ) | |
| STEVE SCOTT, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Terry L. Brady, a *pro se* prisoner, was granted leave to proceed on a claim that Captain Steve Scott of the Marion Police Department used excessive force in effectuating his arrest on June 6, 2007.[1] (Docket # 8.) Captain Scott moves for summary judgment. (Docket # 40.)

Summary judgment is appropriate when "the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986.) Summary judgment may be granted notwithstanding a factual dispute between the parties, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

To determine whether a genuine issue of material fact exists, the Court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that

---

[1] Brady was also permitted to proceed against the City of Marion solely for the purpose of conducting discovery to identify other officers at the scene who he claimed used excessive force against him. (Docket # 8 at 5.) Although Brady was given time to amend his complaint to name these officers, he failed to do so. (Docket # 36.) The City of Marion has since been dismissed as a defendant, and the only remaining claim is against Captain Scott. (*Id.*)

party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion "may not rely merely on allegations or denials in its own pleading," but rather must introduce affidavits or other evidence that "set forth specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is not appropriate if the Court must "choose between competing inferences," *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir. 2005), nor can the Court weigh the credibility of witnesses, since these are functions of a jury. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 627 (7th Cir. 2006.)

The following facts are undisputed unless otherwise stated. Captain Scott has been employed by the City of Marion as a police officer since 1995. (Docket # 40-1, Scott Decl. ¶ 2.) In 2005, he received training and certification to handle a police dog or "K-9" unit. (*Id.* ¶ 3.) He received specific training on when and how to deploy the K-9 as an alternative to other forms of force, such as the use of weapons. (*Id.*) Among other uses, a K-9 unit can be used to chase and apprehend a fleeing suspect. (*Id.*) Since 2005, Captain Scott has been assigned to work with a K-9 named Archer. (*Id.* ¶ 4.)

On June 6, 2007, Captain Scott was on patrol with Archer, who was in the back seat of his Chevrolet Tahoe, which is unmarked but equipped with red and blue emergency lights and sirens. (*Id.* ¶ 5.) At approximately 10:30 p.m., Captain Scott heard detectives with the drug task force state over the radio that a suspect later identified as Brady was believed to have been involved in a drug transaction and was recklessly driving a black car in an attempt to evade police. (*Id.* ¶ 6.) The detectives requested a marked vehicle to assist in stopping the black car. (*Id.*) Captain Scott then heard further radio traffic indicating that the car was fleeing marked vehicles at a high rate of speed in downtown Marion. (*Id.* ¶ 7.)

Captain Scott eventually joined the pursuit behind the lead pursuit car. (*Id.* ¶ 8.) He had his emergency lights and siren activated. (*Id.*) Brady proceeded to make several turns and was driving at speeds of up to 50 miles per hour in areas where the posted speed limit was 25-35 miles per hour. (*Id.* ¶ 9; Docket # 40-2, Reel Decl. ¶ 7.) Captain Scott saw Brady run a stop sign and pull out in front of another vehicle traveling on a cross street. (Docket # 40-1, Scott Decl. ¶ 9.) At some point the lead car failed to negotiate a turn, and Captain Scott became the lead car in pursuit. (*Id.* ¶ 10.)

Shortly thereafter, Brady came to a stop. (*Id.* ¶ 11.) Captain Scott stopped his vehicle approximately 30 feet from Brady's car. (*Id.*) He then saw the driver's door of the car open, and saw Brady's leg come out and his left arm holding the door open. (*Id.* ¶ 12.) In Captain Scott's experience, suspects who have ended a car pursuit do one of two things: stay in the car and wait to be arrested or open the door and run. (*Id.* ¶ 13.) Based on the circumstances, Captain Scott believed that Brady was getting out of his car to run when he opened the car door. (*Id.* ¶ 14.) His experience also told him that persons involved in drug transactions often carry weapons, and he did not know whether Brady was armed. (*Id.* ¶ 15.)

When he saw Brady getting out of the car, Captain Scott made the decision to get out of his own vehicle and open the rear door so that Archer could pursue and attempt to apprehend Brady. (*Id.* ¶ 16.) When Captain Scott opened the door of his vehicle, Archer jumped out. (*Id.*) He was not on a leash, and he immediately ran toward Brady. (*Id.* ¶ 17.) When Archer reached Brady, he was already on the ground. (Docket # 49, Brady Decl. ¶¶ 6-7; Docket # 40-1, Scott Decl. ¶ 19.) Archer stood on Brady's back, and was scratching and biting in the area of his back and neck. (Docket # 49, Brady Decl. ¶ 7; Docket # 40-1, Scott Decl. ¶ 20.) A few seconds later Captain Scott caught up with Archer, grabbed him by the collar, and gave him a verbal command to release. (Docket # 40-

3

1, Scott Decl. ¶¶ 20-21.) Captain Scott held Archer away from Brady while another officer handcuffed him; he then put a leash on Archer and led him back to his vehicle. (*Id.* ¶ 22.) Another officer drove Brady to the jail, and Captain Scott had no further contact with him. (*Id.* ¶ 23.)

Detectives later found multiple plastic bags of cocaine in Brady's car, and he subsequently pled guilty to one count of resisting law enforcement and one count of possession of cocaine with intent to deliver. (Docket # 40-1, Scott Dec. ¶¶ 25, 26.)

Brady was examined by Nanette Brankle, a licensed practical nurse, at the Grant County Jail on June 8, 2007. (Docket # 40-4, Brankle Decl. ¶ 9.) He complained of "dog bite wounds." (*Id.*) She observed three superficial lacerations across Brady's neck and back which she characterized as "not puncture wounds but just scratches." (*Id.* ¶ 11; Docket # 40-5, Medical Record.) She determined that he had normal range of motion in his shoulders and back, and that the scratches did not appear to be infected and showed no redness, drainage, or swelling. (Docket # 40-4, Brankle Decl. ¶ 11; Docket # 40-5, Medical Record.) His injuries did not appear serious to her, but she gave him a tetanus booster, which is commonly given as a preventative measure after an animal bite. (Docket # 40-4, Brankle Decl. ¶ 15.) On June 11, 2007, another nurse at the jail performed a routine physical examination on Brady. (Docket # 40-4, Brankle Decl. ¶ 12; Docket # 40-6, Medical Record.) Her notations indicate that her examination of Brady's eyes, teeth, chest, and heart were all normal. (Docket # 40-6, Medical Record.) She noted on the form, "Several abrasions on back. None appear to be infected." (*Id.*) Brady was in the Grant County Jail continuously until February 2008, but there is no record of him receiving any further treatment for these injuries. (Docket # 40-4, Brankle Decl. ¶ 16.)

An officer's right to arrest an individual includes the right to use some degree of physical force, but the Fourth Amendment requires that force to be objectively reasonable in light of the

totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* Factors to consider include the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was resisting arrest or attempting to evade arrest by flight. *Id.* The Court must employ an objective standard, viewing the matter "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Furthermore, the "calculous of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Here, the undisputed facts show that immediately prior to Brady's arrest, Captain Scott witnessed him driving recklessly through the streets of Marion, endangering bystanders and the numerous officers pursuing him. Captain Scott was told by fellow officers that Brady was suspected of being involved in a drug transaction, and based on his training and experience, he believed that Brady might be armed. He made a split-second determination when he saw Brady begin to exit his car that Brady was going to run, necessitating the use of the police dog to apprehend and subdue him.

Brady claims that he was never planning to run when he exited his vehicle, but was instead attempting to surrender to police. (Docket # 49, Brady Decl. ¶ 6.) He claims that he exited the vehicle with his hands up and lied down on the ground before the dog was released, a process he estimates took about 60 seconds. (Docket # 49, Brady Decl. ¶ 6; Docket # 48, Pl.'s Mem. at 2.)

5

Another officer on the scene offers a different version, attesting that Brady looked like he was going to run until he saw Archer approaching, at which point he dropped to the ground. (Docket # 40-2, Reel Decl. ¶ 16.) For purposes of this motion, the Court must accept Brady's account as true. *Heft*, 351 F.3d at 282. However, Brady's account that he was attempting to lie down on the ground to surrender after he got out of the vehicle does not necessarily contradict Captain Scott's account, which was that as soon as he saw Brady taking steps to exit the vehicle, he decided to release the dog. He attests that immediately after that he was turned toward the rear of the vehicle, and it follows that he would not have seen what Brady was doing immediately after he exited the car. (*See* Docket # 40-1, Scott Decl. ¶ 16.)

Moreover, even if Captain Scott had seen Brady lying on the ground immediately prior to releasing the dog, this would not have made his use of force *per se* unreasonable. As the Seventh Circuit observed in a similar case which, ironically, also involved Captain Scott and Archer:

> When a suspect waves the white flag of surrender, the use of force in connection with an arrest may, as an objective matter, become unnecessary and inappropriate. Not all surrenders, however, are genuine, and the police are entitled to err on the side of caution when faced with an uncertain or threatening situation.

*Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009). In *Johnson*, Captain Scott and Archer were chasing a suspect, Johnson, on foot when he encountered a fence, turned around, put his hands in the air, and said, "I give up." *Id.* Archer then bit Johnson's arm and Captain Scott knocked him to the ground. *Id.* Johnson struggled to release himself from the dog's bite, which Captain Scott interpreted as resistance, so he struck him. *Id.* Archer then moved to bite Johnson's leg, at which point Captain Scott was able to hand-cuff Johnson and then ordered Archer away. *Id.*

The Seventh Circuit affirmed the grant of summary judgment for Captain Scott, concluding that the amount of force used was reasonable as a matter of law. *Id.* Based on the

nature of the crime Johnson was suspected of committing, a shooting, Captain Scott reasonably concluded that he may have been armed. Further, Johnson had been involved in a reckless flight from police in a vehicle prior to the foot chase. *Id.* at 660. In the Seventh Circuit's view, the mere fact that Johnson had raised his hands and said "I give up," did not mean that he was subdued. *Id.* The Court observed:

> Scott had no idea how Johnson was going to behave once he was cornered. No law that we know of required Scott to take Johnson's apparent surrender at face value, a split second after Johnson stopped running. Until he encountered a fence that was too high for him to jump over, Johnson had used every method at his disposal to flee from police. The surrender also did not establish that Johnson was unarmed. A reasonable officer could think that the use of the dog was necessary to help control Johnson; otherwise, Johnson might have had the time he needed to retrieve and use a weapon. . . . In short, Scott's use of force—in the form of Archer—to subdue Johnson was objectively reasonable, given the uncertainties in the situation that faced him.

*Id.* at 660-61.

These same considerations warrant a finding of reasonableness here. Although Brady was not suspected of being involved in a shooting, Captain Scott has offered undisputed testimony that he believed Brady might be armed because, in his experience, persons involved in drug transactions often carry weapons. Brady had just led police on a high-speed chase, endangering the safety of police officers and innocent bystanders. When Brady began to exit the car, Captain Scott had no way to divine his intent. Up to that point Brady had made great efforts to evade arrest, and Captain Scott's experience told him that Brady was likely to run. Even if Captain Scott had seen Brady with his hands up or starting to lie on the ground, Brady was not yet subdued. Captain Scott had no way of knowing how Brady would react when approached by police, given his prior efforts to flee, or whether Brady had a gun in his possession. Even by Brady's account, these events unfolded in a matter of seconds. In the tense and rapidly evolving

7

situation presented to him, Captain Scott erred on the side of caution and made a split-second decision to release the dog to help him subdue Brady. As in *Johnson*, Captain Scott's decision was not objectively unreasonable.

Furthermore, the objective record shows that Brady suffered only minor injuries as a result of his contact with Archer. Brady claims that he was "viciously attacked, mauled, and brutally bitten" by Archer. (Docket # 49, Brady Decl. ¶ 7.) The medical records belie this assertion, and instead show that Brady suffered only superficial injuries consistent with Archer having briefly scratched and/or nipped at his back. (*See* Docket # 40-4, Brankle Decl.; Docket # 40-5 and #40-6, Medical Records.) Brady does not contest the authenticity or accuracy of the medical records, and indeed, points to them as support for his version of events. (*See* Docket # 48, Pl.'s Mem. at 4, 17-22.) Based on the jail medical records, however, no reasonable jury could believe Brady's account that he was "viciously attacked, mauled, and brutally bitten" by Archer. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In short, Brady has not shown that the amount of force used by Captain Scott was unreasonable under the circumstances.

Even if Captain Scott used more force than was necessary to effectuate Brady's arrest, he would be protected by qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The protection of qualified immunity will apply if the official makes a mistake of fact, a mistake of law, or a combination of the two.

*Pearson v. Callahan*, 550 U.S.— , 129 S. Ct. 808, 815 (2009). In essence, qualified immunity protects all but the "plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227-29 (1991).

      Assuming Captain Scott made a mistake in interpreting Brady's actions as an attempt to flee on foot, this was a reasonable mistake under the circumstances. As stated above, Brady was suspected of having just been involved in a drug transaction and had attempted to evade arrest by leading the police on a high-speed chase through the streets of Marion. Captain Scott attests, without contradiction, that in his experience a suspect who exits his vehicle after a high-speed chase is likely to run. It was not unreasonable for Captain Scott to conclude in the heat of the moment that Brady was likely to flee and may have had a weapon, even if he was mistaken in his assessment. *Smith v. Ball State Univ.*, 295 F.3d 763, 770-71 (7th Cir. 2002) (police officer was entitled to judgment where, even accepting plaintiff's account that he was not actively resisting, a reasonable officer who happened on the scene could have misconstrued plaintiff's actions as resistance requiring the use of force).

      Furthermore, given the state of the law in June 2007, it was not unreasonable for Captain Scott to conclude that using a police dog to help him subdue Brady was permissible under the circumstances. *See, e.g., United States v. Lawshea,* 461 F.3d 857, 860-61 (7th Cir. 2006) (use of police dog was reasonable to prevent suspect from fleeing); *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003) (officer's use of police dog to bite and hold suspect until officers arrived on the scene did not constitute excessive force where suspect had fled from police and may have had a weapon); *Jarrett v. Town of Yarmouth*, 331 F.3d 140 (1st Cir. 2003) (officer's release of

police dog to bite and hold suspect did not violate the Fourth Amendment).[2] Therefore, even if Captain Scott used more force than was necessary to effectuate Brady's arrest, he would be entitled to qualified immunity.

For the reasons set forth above, the Court:

(1) **GRANTS** the defendant's motion for summary judgment (DE 40); and

(2) **DIRECTS** the clerk to enter judgment in favor of the defendant.

SO ORDERED.

Entered this 5th day of October, 2010.

/s/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge

---

[2] Although one court held prior to 2007 that police violated the Fourth Amendment by failing to give a verbal warning before sending a police dog into a home with the command to bite whomever it found, resulting in the home's occupant being mauled by the dog while she was sleeping, that case presented an entirely different set of facts than those presented in this case. *See Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir. 1998). In this case, the dog was released in an open area to subdue a suspect who had led police on a high-speed chase, had exited his vehicle, and may have been armed.